Oral argument not to exceed 15 minutes per side. Mr. Garcia or Mr. Cullan Meathe v. Daniel Ret. Mr. Garcia. Good morning, Your Honors. May it please the Court. David Garcia on behalf of the appellants, Mr. Cullan Meathe and Yellow Cab. Your Honors, this is an appeal from an opinion and order of Judge Averin Cohn of the Eastern District of Michigan. In that order, essentially, Judge Cohn simultaneously granted summary judgment on certain claims and also denied a request or motion for leave to appeal, or leave to amend, I should say, to supplement those pleadings. Very broadly, to give just a quick context to my argument today, this case involves the MetroCars companies in suburban Detroit. And anyone who's spent time in that area over the last 20, maybe even 30 years is probably familiar with the black sedans that drive around town, taking people to and from the airport and from hotels. That's MetroCars, and that's the essential business that's underlying this whole dispute. That is a company that was founded by my client, Mr. Meathe, in the early 1990s, when he was about 18 years old, and literally founded in his mother's basement. And he ran the company, essentially, with three fretspits in between ever since. Over time, Mr. Meathe took in a partner and other executives, which becomes relevant to this case, because the partner who eventually joined this business with Mr. Meathe is the defendant, Mr. Eaton. And another relevant defendant, who became the CEO and COO of the company, is Mr. Rett, Daniel Rett. The relationships eventually progressed to the point where, at the times relevant to this case, Mr. Eaton was the majority controlling shareholder, owning 51% of the business to Mr. Meathe's 49%. And again, Mr. Rett had his dual roles as CEO and COO, essentially running the day-to-day operations of the business, while Mr. Meathe essentially moved the floor to start a similar line of business in that geographic area. And that's the company Yellow Cab, who I also represent. I think your brief sets out the factual relations between the various parties. And one of the questions I have is, in this case, what injury did your client sustain that is distinct from the injury or the devaluation of the corporation? Because it seems that those are pretty closely aligned. I understand, Your Honor, and I think that the issue of the corporate injury versus personal injury kind of permeates all of the claims, at least it did in the eyes of Judge Cone's opinion. Here is what I would say. There are, and I'm going to move to a case on this in a moment, but the injury itself, when analyzing an injury to what appears to be a corporate entity, I think it is clear that you look at essentially whether that injury just flowed through to the shareholders. In other words, my 30 percent or your 40 percent. Was it simply just derivative? Or was there a specific injury that was felt, in essence, by only one of these shareholders? That would be the first part. And I think here, to answer your question, because of the facts that I think are laid out in our brief, I'm going to highlight just a few of them. The injury here was not felt in any way by the 51 percent owner who committed the wrongful acts that I'm going to talk about. The injury fell upon my client, Mr. Meade, almost exclusively. That's sort of the first prong. The second prong is there really is, aside from loss of value of the company or anything related to the Metro Group, Metro Cars entity, a personal, individual loss to Mr. Meade that really the court gave little, if any, consideration to. Because we did plead a separate personal injury. And that is, Mr. Meade, in this so-called auction, I'm sure you've all read about it in the briefs, attempted to qualify, not just by himself, but with various partners, including a company called Trowbridge. He ultimately could not do so. And the reason is very important. The reason is because his 51 percent shareholder partner, whatever adjective you want to use, had worked out an agreement ahead of time with the bank, the so-called stalking horse bid, to purchase these assets. What he did on top of that, though, is one of the wrongful acts that's really at the center of all of our claims. And that is, after working out that agreement with Mr. Meade, using that leverage he had with the bank, he said to them point blank, and this is in letters, this is in his deposition testimony, that if Mr. Meade were qualified by the bank to participate in this auction in any way, he was going to essentially breach his contract with the bank and withdraw his bid. The bank, understandably, you can see in their letter, which we cite, is not very happy about that. And that is a 51 percent owner, and I believe at the time president of the company, essentially saying to the bank, when he's supposed to be representing at least the best interest of the company itself, I don't want this person who might qualify to purchase these assets to participate. I don't want companies he may do business with to participate. That is about as antithetical as I can think of to a majority-controlling owner-slash-president acting in the best interest of, forget Mr. Meade, his fiduciary obligation, of just the company. Because if nothing else, he should certainly want to, as many bidders as possible, drive up prices. But who suffers from having the price not driven up? Well, I think it's twofold, Your Honor. At first- Pretty much the company, though, right? Well, I agree with that part. But the second part is that Mr. Meade, there's sort of two chunks of damages. There's the diminution or the loss of value, which I understand Your Honor is talking about. But then there's the second part, that because of this controlling owner excluding Mr. Meade, he now does not have the opportunity, either individually or via his partner, to submit any kind of corresponding bid and essentially compete on the same level terms. And I think it's important. They say, and I want to get this precisely right, they say in their brief, and this is their March 15 response brief, their first brief they filed, this is a quote, quote, Moreover, both Eaton and Meade were acting in their capacities as independent businessmen, not as shareholders of the corporation when they each separately worked towards acquiring the assets of a defunct entity. And I think that draws a very bright line between where the two parties are in this case. We've cited in our brief the law that demonstrates that a majority controlling owner does have a fiduciary obligation in these circumstances. He's the president of the company as well. They seem to think that in this transaction, which involved this particular MetroCars business, that these fiduciaries could just remove their fiduciary hats, fling it to the side, and become arms-length businessmen. Now, if they were truly arms-length, if these relationships didn't exist, perhaps we could just call this conduct rather aggressive business tactics. But it's not aggressive business tactics when you have a fiduciary obligation to your minority shareholder. And I think that's really the point there. To follow up on the question, since your question kind of sparked this, we've cited in our brief, in many cases, both sides have, about this distinction between individual arm, entity arm. And I want to bring to the Court's attention just one case. It was just decided in June of this year, so it's not part of any of the briefs. It's come out since the parties filed everything. It's the case of Nicol B. Shanahan. The cipher for that is 2013 WL2402852. That is from the Missouri Court of Appeals, which I realize is certainly not controlling on this Court. But their logic, I think, follows exactly the same precedents that are before you. And what that Court essentially said is where there was self-dealing, in that case where the directors essentially negotiated discounted purchase prices for them to take control of certain assets of the business, that where there was this kind of self-dealing going on, that those interested officers, the self-dealing parties, I'll call them for short, really did not share in the same loss. So in other words, they didn't have a, whatever their percentages were, 50% or 75% share of the arm. They were essentially taking all of the benefits, acting in their own interest, and inflicting the harm on the minority or not controlling party. And I think that's really the lens, at least I hope, that the Court will use to analyze this case. Because there really is, when you look at the conduct of Mr. Eaton, Mr. Redd, they escaped the harm by essentially through a series of acts, either taking property or excluding Mr. Meath from the opportunity to meaningfully participate in this process. And the end result is moving assets from their left pocket into their right, as opposed to a loss of their 51% interest. And I just want to highlight, to follow up on that, the five key facts here that I think were really ignored by the lower court. Because there's, I hope the panel will see this in reading the briefs. What the judge, I think, did, he made what I'll mildly call some very negative comments about our case and what he thought of the merits. But he really took the so-called undisputed facts from the other side and ignored a lot of the depositions and documents that we offered, at least in our opinion. And I think he, in the process, kind of turned the summary judgment standard on its head. Because here is what we actually provided to the Court. And I'm not talking about allegations, I'm talking about hard proof. That Mr. Eaton, in order to participate in this auction process, unilaterally and with no one's permission, released the CEO, COO, Mr. Reck, from a non-compete company, which Mr. Eaton admits in his deposition would have prevented him from participating in this venture. We also provided testimony, letters, etc. I already mentioned about the threats to breach the agreement with the bank, but that other parties were simply not receiving due diligence type information to evaluate this company. That, again, goes to the self-dealing going on here, where Mr. Reck and Mr. Eaton were operating in their own interest to not disclose information to other people, not just Mr. Mead. And I see that my time has just expired. If the panel has any questions, I would be happy to take them. Well, I actually would like you to go ahead and just very quickly cite the other three factors that you wanted to mention. Without explanation, just cite them. I will. The final two was, this is cited in our brief, the gifting of Mr. Mead's 50% interest in a company in Grand Rapids. Again, Mr. Eaton admits that that was the deal all along. He's just asked for the list. Okay, I'll move on. And finally, the last item was – well, actually, I think I managed to pick them all in my last sentence. Thank you. I appreciate that, Judge. Thank you. Counsel? Good morning. Good morning. There is an important procedural in such a big context to look at Judge Cohen's opinion on. Procedurally, the case in Michigan was initially stayed by him. And the reason he did so was because a substantially similar counterclaim had been filed by the plaintiffs down in Florida in response to a trademark infringement. Because the claims were similar, because discovery was ongoing, Judge Cohen stayed the Michigan case. Discovery did occur in that case, 22 depositions, approximately 2,000 pages of testimony. Ultimately, that Florida case was transferred up to Judge Cohen, and he lifted the stay in the Michigan case, and we filed our motion for summary judgment, Rule 56 motion. Now, Rule 56 motions usually focus on the elements of the alleged causes of action and the victim. We did that in ours. Judge Cohen focused more on the damages and the questions about standing than he did in going through all the elements of various causes of action. And I think he did that for a very smart reason. It was a much cleaner way to approach the deficiencies in the six counts that remained after we filed the motion for summary judgment. It's notable that after we filed the Rule 56 motion, the defendants, or the plaintiffs, abandoned seven of their 13 counts. They abandoned the divergative claim. Let's not talk about the ones they abandoned. What about the ones they didn't abandon? The remaining ones had to do with two types of damages in Judge Cohen's opinion. First, it would be the type of damages that occurred to the corporation, such as the devaluation of its assets. That, plainly Judge Cohen found, he's plainly correct, was a corporate right and claim, and could not be opposed by Mr. Meath unless he did so derivatively, and he was not. The second type of damages is more interesting intellectually. What Mr. Meath was trying to do was to suggest that he should have been provided the opportunity he did at the auction. There are two facts that were undisputed and were admitted by the plaintiffs in this case that undercut that completely. First of all, Metro Group's assets were taken over by the bank. It wasn't something that my client did. The assets were taken over by a bank, a receiver was appointed, and the bank sought ways to dispose of them to deal with their $42 million debt. That can't be placed on my client's head. Second, Mr. Meath was never qualified to become a bidder at the auction. Did Judge Cohen rely on that? Yes, he did, and he also relied on it for good reason, because it was admitted. In our statement of undisputed facts, we said that on June 25, 2009, SRR, the investment banker on behalf of the bank group, sent correspondence to Meath in his order formally acknowledging that Meath had informed the bank group on June 23 that he would be unable to become qualified to bid at the auction, and that as a result he was not a qualified bidder, admitted. Now, in that failure to become qualified, did your client play any affirmative role in preventing him from becoming a qualified bidder? I don't believe so. I believe what these two gentlemen were doing were actively competing against one another to try to become bidders at the auction and purchase the assets of Metro Group, of which neither one was prohibited. But this letter, which was admitted and is a letter from the bank, clearly shows that it was a financial qualification, and Mr. Meath could not meet it. His balance sheet was terrible at the time, just as Metro Group's was. Neither one of them could be a qualified bidder. So under those circumstances, and certainly dealing with the Odyssey case that we cited in our brief, which permits majority shareholders under those kind of circumstances where there's an auction, even in that case it was the majority shareholder acting as a predator that caused the foreclosure sale, courts have found that that's not anything improper, because you're acting under the hat of a predator, or in this instance solely under the hat of a bidder at an auction. One of the six claims was an oppression of minority shareholders claim under that statute. Is that correct? That's correct. What were the essential factual arguments that underlay that claim? Judge Cohen identified four facts that underlie it. None of them supported the claim. I'm talking about what their argument is. What's their argument, as you see it, for oppression of minority shareholders? Their argument, as I see it, is that they believe that because Eaton was a majority shareholder of the company, that he owed a duty to Mr. Meath not to bid at the auction. I can't find the connection. It's true that Mr. Eaton was a majority shareholder, 51% to 49%. But nothing he was doing, acting as a bidder at the auction, had to do with his rights as a shareholder. He wasn't making a shareholder vote. He wasn't doing anything like that. The argument is that this was sort of an overall scheme to change 51% into total ownership of the same assets. And that's why I go back to the first salient fact that Judge Cohen focused on, which was the bank took the assets. But the reason, as I understand it, that Judge Cohen threw that out was because at the time they brought the suit, they weren't shareholders. Is that correct? He cited several reasons. Is that correct? That is one of the reasons why he did it. What's the other reason? Because that one sounds questionable. I think I can helpfully address that one. But let me point to the other one first. He did say that nothing that Eaton was doing he was doing as a shareholder. Acting as a bidder at an auction is not acting as a shareholder. But let me address the issue about whether or not Meath was a shareholder at the time he filed the suit. I will confess that I could have read Judge Cohen's opinion more carefully than I did. What Judge Cohen focused on was he talked about Meath needs to have, as any shareholder does, a shareholder to be a shareholder needs to have a proprietary interest in the corporation. And he cited the Michigan statute, and I think I pretty closely just quoted it. Well, I guess when I think of oppression of minority shareholders, I think of some kind of deal where the majority does something. Maybe they sell all the assets to an entity that's controlled by them and then collapse the corporation, something like that. If they did something like that, that would be kind of a classic oppression of minority shareholders, which presumably the Michigan statute would address, right? Correct. But in that hypothetical, they're no longer shareholders because it's been dissolved. So it would seem to me that at least in some classic oppression of minority shareholder cases, when you bring the suit, you no longer have an interest because it's been taken away from you by the very people who are oppressing you. What am I missing? What you're missing is the connection between what somebody did as a majority shareholder and consequences to the minority. Here, the majority did nothing. But I thought the argument had to do with what the minority did, which was lose their shares. Once they lost their interest in their shares, they could no longer bring a case under that statute, I thought, was Judge Cohen's rationale. Let me parse that down. Judge Cohen did say that was a rationale. But you're backing off of that or you're defending that? I'm defending it. Well, what's the defense? The defense is you have to focus on the words he utilized. He utilized proprietary interest of the shareholder. Who utilized? You mean you say he who? Judge Cohen focused on the words proprietary interest in the Michigan statute defining shareholders. There is case law out there from this circuit which holds that where a company has lost all its assets and is not operating as a going concern, that a shareholder does not have a proprietary interest in these shares. I can provide the court with some more. Is there a distinction in Michigan law between a corporation being dissolved and a corporation being wound up? A corporation is dissolved and then it goes through a winding up process. They're distinct steps, aren't they? Are they not in Michigan law? There are. Okay. And this corporation was not only dissolved, it was wound up, was it not? This corporation had it go the other way. The bank took all its assets before it was formally dissolved by the Secretary of State. Okay. To answer my question, it was not only dissolved, it was wound up, right? It was. Okay. And Michigan recognizes the distinction? Yes. And we are applying Michigan law. Okay. So here we have this corporation that is not only dissolved, it's wound up, and the issue is whether the former shareholders have standing for a wound up corporation. And Judge Cohen said that the statute that defines shareholders uses the present tense. Anything wrong with that? Nothing wrong. Okay. In fact, are you aware of the special panel published opinion of the Court of Appeals in Estes versus Coyler? It's found at 250 Mishap, 270, which is the equivalent of an en banc decision of the Michigan Court of Appeals, which talks about this statute and says, whereas the plaintiffs in a 1489 suit may only be current shareholders. Are you aware of that decision and that language in the opinion? Yes. Does that support you? Yes. Okay. Why didn't you cite the opinion to us? I missed it. Okay. I apologize. Judge? That case actually held that the shareholders could bring the suits, so to the extent that it holds that anybody can't bring a suit, it's inherently dictum, isn't it? I understand that. I would like to give you the case from your circuit that holds that a proprietary interest in shares requires an ongoing business. What would Michigan law do if you had a majority that was oppressing the minority and the way they did it was to either merge with another company that they controlled or give all the assets to another company that they controlled and then immediately both wind up and dissolve the corporation? Would the statute then not apply to protect them? I think it would in that circumstance, but, Judge, I'm trying to draw the distinction between that factual circumstance and the one that occurred below. Right. But you would agree that at least in some circumstances you can be a wound-up, dissolved corporation and still go into court after that wind-up dissolution and bring suit because the majority caused that wind-up or whatever. Correct. So that's the problem I'm having with the kind of categorical preclusion that Judge Cohen seems to be applying here. Well, as a categorical proposition, it may be subject to criticism, but as to the facts here and how it was applied, the majority did nothing to cause the assets of the company to be foreclosed upon by the bank. The bank did that. It's been admitted in the undisputed. But that isn't what Judge Cohen relied on when he was dismissing that claim. That's the concern I have. Or is it? Well, I think he relied upon it. I thought he just said they aren't shareholders because it's been dissolved and wound up and therefore they can't bring the claim. That was what's problematic to me. So you want to say we should affirm on an alternative ground? Well, I want to give you the case, Owens v. Commissioner for Internal Revenue, 568 Bed 2nd, 1233 6th Circuit, 1977, which focused on the fact that in order to have a proprietary interest in shares, the business has to be ongoing. That did not occur here because at the time he filed suit, the business was long ago. You can't oppress minority shareholders when all it is is a corporation that owns assets and then doesn't have an ongoing business. The assets had been taken over by the bank, so they were no longer controlled by the directors, the officers, the shareholders, or anyone. How does the Wazowski decision apply to this particular issue in your opinion? I'd try to go back to the lack of causation here because Mr. Meath was never qualified to be a bidder at the auction, so he's really lost nothing. As Judge Cohen found, his damages in that context were imaginary. He was never going to end up with these assets under any circumstances. But that's your client's position, and the opposite position that he takes is that he ought to have standing to go in and impress those claims because there's a fundamental disagreement with some of the assertions that you and your client make as to why he was unable to participate in the bidding process. So my question goes back to that fundamental, his ability to access the courthouse to allege those claims on the standing ground. He certainly accessed the courthouse. He did not prevail because Judge Cohen found for a whole bunch of reasons that his damages were imaginary and that he could never satisfy all the injury impact requirements to have standing to pursue these damages. He was never going to end up with the assets at the purchase. So there's no connection between the fact that my client got them as a qualified bidder and he didn't as an unqualified bidder and he admits he was unqualified financially to do so. Thank you. Thank you. Further questions? No. Thank you. Just a couple of quick points. First, on the questions that you were asking regarding essentially standing and the shareholder derivative claim, I would direct the court, if it's helpful, to our reply brief. This is our April 17th brief. There's no shareholder derivative claim, is there? I'm sorry. If I said derivative, I apologize. That's what you said. Shareholder oppression. Minority shareholder oppression statutory claim is what you're talking about. Correct your question. I apologize. Okay. What exactly in your reply brief? You cite a couple unpublished Michigan Court of Appeals decisions that are not precedentially binding and are not, therefore, Michigan law. Do you have any authority for your position as to standing, as to the oppression claim, other than unpublished opinions, which are basically you can take them for a waste of value. Do you have any authority? Your Honor, yes, I believe we do. Okay. Tell me what it is. I'll refer you specifically to page 27 of our reply brief. You can see that in context. But first of all, as a factual matter, the first point there is that when this lawsuit was filed in April of 2011, this company was not yet dissolved. It was active. It was not dissolved until mid-July of 2011. That's fact point one. But second, as you'll see at the bottom of the page and on to the next, we cite the Sixth Circuit's opinion from – Did they still have their assets when you filed the lawsuit? By that point in time, I believe, Your Honor, the assets that they held were buildings, but not, to be candid, the metro car, limousines, et cetera. There were essentially different parts of the business. But until either that time or shortly before that time, they would have maintained those things. I don't want to interrupt you. Judge Griffin, you've got to keep going. Did Judge Cohen have an alternative ground for rejecting the oppression of minority shareholders claim,  Your Honor, from my review of the notes on the opinion, that is certainly the one he hung his hat on. If he mentioned another one. Well, we'll take a look at it and see if there's an alternative ground. And I see we've used a bunch of your time. Do you want to take a minute to – Well, okay. What is the authority on oppression? Tell me what it is. Certainly. Give me the site. Sure. The Cleveland Branch case, which is cited on page 27, it's 263 F3rd 513 at 524, 226. Okay, F3rd. Sorry, I'll slow down. It's 263. Okay, this is a Sixth Circuit opinion? Correct. Construing Michigan law? I'm sorry? Construing Michigan law? I do not have that in my notes, so I don't want to misinform, Your Honor. If we have an opinion by us construing Kentucky law, what does that have to do with this case? Understood, Your Honor. And the case may well apply Michigan law. I just don't want to misrepresent anything. You don't know what it says. Okay, is that the best authority you have, other than your unpublished nonbinding opinion? From the Sixth Circuit on an issue of standing, I can't imagine there is too much. No, no. How about Michigan authority? We're dealing with Michigan law. Give me your best Michigan authority that you have standing for your stockholder oppression suit. The best authority, frankly, we can use the authority from Judge Cohn because, as we were discussing, he used the lack or the fact that the company had been dissolved, which was erroneous. Here you have a company that actually exists. Basically, you have no authority. That's your answer, right? So you apply the plain language of the statute? I'm trying to help you out here. I understand, Your Honor. And the best case I can directly do is the Sixth Circuit case. And I apologize for not being able to represent whether it's Michigan or Kentucky. Okay, what is wrong with this special panel opinion, which Judge Rogers is right, the statement I read from the special panel is not the holding of the case, but it is essential to the reasoning for the holding of the case. And without that reasoning, the holding doesn't apply. So the Court of Appeals has stated in a binding opinion that this statute, whereas the plaintiffs in a 1489 suit may only be current shareholders. Why isn't that the law of Michigan? Well, I guess my answer to that in simplest terms is whether it's the law in Michigan or not, here on the facts, he actually was a shareholder at the time. The company existed and was not dissolved. Okay, your position that he was a current shareholder? At the time the lawsuit was filed, yes, sir. Okay. Thank you. And I see I'm out of time. Thank you. It was an interesting case.  The case will be submitted.